U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

MAY 20 2010

CHRIS R. JOHNSON, CLERK

BY

DEPUTY CLERK

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

|  |  |
|---|---|
| MITSUBISHI HEAVY INDUSTRIES, LTD. and MITSUBISHI POWER SYSTEMS AMERICAS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY,<br><br>Defendant. | Civil Action No. 10-5087<br><br>Demand for Jury Trial |

### COMPLAINT

Plaintiffs Mitsubishi Heavy Industries, Ltd. ("MHI") and Mitsubishi Power Systems Americas, Inc. ("MPSA") – collectively, "Mitsubishi" – bring this action against defendant General Electric Company ("GE") to recover for antitrust and other injuries. Plaintiffs allege the following based on their personal knowledge, publicly available materials, detailed investigation by counsel, and upon information and belief:

### NATURE OF THE ACTION

1.     This case involves a scheme by GE to monopolize the sales of variable speed wind turbines in the United States. GE dominates the market, with a share of about 70%. In 2006, Mitsubishi gained a foothold in the U.S. market

after securing significant contracts for the sale of variable speed wind turbines. Faced with this emerging competitive threat, GE embarked on an unlawful scheme to drive Mitsubishi and other providers out of the U.S. market. This scheme continues to this day and, if not stopped, will prevent effective competition.

2.     As part of its unlawful scheme, GE has made baseless claims of patent infringement against Mitsubishi. GE knew that merely by initiating patent litigation against Mitsubishi, it would intimidate potential wind turbine purchasers and discourage them from purchasing Mitsubishi's wind turbines while the litigation was pending. GE also knew that other wind turbine manufacturers would fear the same loss of customers and potential sales.

3.     GE's unlawful scheme has worked. Prior to the initiation of GE's first lawsuit against Mitsubishi, Mitsubishi had sales of approximately $2 billion per year of variable speed wind turbines in the United States. Since GE's litigation campaign began over two years ago, Mitsubishi has not sold a single variable speed wind turbine in the United States. Several other manufacturers have succumbed to GE, taking licenses in order to continue selling in the United States.

4.     GE launched its first suit against Mitsubishi in February 2008 by filing a complaint before the United States International Trade Commission ("ITC"). In the investigation, GE charged that Mitsubishi's variable speed wind

turbines infringed on three GE patents. Two years later, in January 2010, the ITC ruled against GE on its infringement claims against Mitsubishi.

5.  Only weeks after the ITC's ruling – before Mitsubishi could begin to re-initiate its presence in the U.S. market – GE launched a new suit against Mitsubishi alleging infringement of two other GE patents not mentioned in its first suit. This, GE hoped, would prolong the period of uncertainty over Mitsubishi turbines in the U.S. market for the pendency of the second suit. In a press statement that accompanied the lawsuit, GE announced that "there are multiple areas where MHI's 2.4 megawatt wind turbines infringe on GE's existing patents." GE Prepared Statement (Feb. 12, 2010). This statement was designed to lead potential customers to believe that, each time Mitsubishi defeated GE's claims of infringement in court, GE would simply file more patent suits.

6.  Facing serial claims of patent infringement, Mitsubishi undertook its own investigation and evaluation of GE's allegations.

7.  Mitsubishi discovered a shocking pattern. GE has built the portfolio of wind turbine patents it used against Mitsubishi by using knowledge it obtained in government-funded programs in the early 1980s and from sources outside the United States, without disclosing the original sources to the U.S. Patent and Trademark Office ("PTO"). GE has omitted references to studies; it has physically removed captions from graphs that disclose their originator; it has concealed

material prior art; and it has omitted the name of an inventor whom it did not control. GE's patent empire is built on a fabric of fraud.

8.    GE's scheme has been difficult to detect because of the patents' technical complexity and because patent prosecution is an ex parte process in which over-committed Examiners with little time for independent analysis must rely on the submitting party to comply with federal law requiring complete candor in the disclosure of relevant prior art.

9.    As set forth below, GE had ample reason to know that all five patents it has been asserting against Mitsubishi and others in the market either were procured or enforced through fraud, and yet GE has deliberately concealed its knowledge that the patents were unenforceable.

10.    GE knew that its broad claim under U.S. Patent No. 5,083,039 ("the '039 patent") was invalid because of its own prior, publicly funded work in the 1980's. Using U.S. taxpayer money, GE researched variable speed wind turbine technology and published a report in 1984, disclosing the use of certain types of power devices called inverters on which GE had obtained patents. In 2002 – after those patents had expired – GE acquired a patent on related variable speed technology (the '039 patent) from the defunct Enron Corporation. GE knew that the claimed subject matter of the '039 patent was invalid in view of prior art because it was *GE's own 1984 report* that disclosed that claimed technology.

4

Nevertheless, in late February 2008, GE asserted this patent against Mitsubishi before the ITC.  GE failed to produce the 1984 report even though Mitsubishi's discovery requests clearly encompassed it.  GE filed and maintained the claim of patent infringement in bad faith.

11.    GE obtained four additional patents through fraudulent conduct before the PTO, including withholding material prior art.  In the absence of such conduct, these patents would have not issued.  Despite knowing that the patents were unenforceable, GE has improperly filed and aggressively litigated claims of patent infringement against Mitsubishi because it knows that as long as it has a patent infringement lawsuit pending, Mitsubishi has great difficulty selling variable speed turbines.

12.    GE has used the lawsuits as a marketing tool.  GE has intimidated Mitsubishi customers by advising them either to purchase license agreements from GE or face patent infringement claims themselves.

13.    GE's improper conduct has injured competition in the variable speed wind turbine industry, has hurt consumers, and has severely injured Mitsubishi's business.  GE's aggressive use of its invalid patent claims has created an obstacle to implementation of various government initiatives for the encouragement of wind power as a renewable energy source.

14. GE's improper conduct also imperils Mitsubishi's investments in this State. On May 18, 2010, MPSA signed a development agreement with the State of Arkansas to construct and operate a wind turbine manufacturing plant in Fort Smith, Arkansas, on 100 acres of land formerly part of Fort Chaffee. The development agreement, which creates obligations on MPSA, secures the construction site and reflects an expected investment by MPSA of well over $100 million. MPSA's plant will ultimately employ over three hundred people. It will manufacture nacelles – a core component of wind turbines which use the technology that is at the center of GE's attacks. If GE's improper conduct continues, the plant once built, will have to sit idle, as there may be no U.S. demand for Mitsubishi variable speed wind turbines.

15. Mitsubishi brings this action under the antitrust laws of the United States to remove the unlawful barriers to competition that GE has erected and to restore competition in the U.S. market. Mitsubishi also sues for violations of federal and state law barring unfair competition and interference with customer relationships. It seeks injunctive relief and to recover damages, including treble and punitive damages.

## THE PARTIES

16. Plaintiff MPSA is a Delaware corporation with its corporate headquarters in the State of Florida. MPSA engages in the development,

manufacture, and distribution of variable speed wind turbines and components thereof. MPSA is a subsidiary of Mitsubishi Heavy Industries Americas, Inc. ("MHIA"), which is a wholly-owned subsidiary of Mitsubishi Heavy Industries, Ltd. ("MHI").

17.    Plaintiff MHI is a Japanese corporation with its principal place of business in Tokyo, Japan. MHI designs, manufacturers, and distributes variable speed wind turbines and components thereof.

18.    Defendant GE is a New York corporation with its principal offices in Fairfield, Connecticut. It is a diversified company that sells products and services throughout the United States. GE is the assignee and purported owner of the following patents pertaining to variable speed wind turbines: the '039 patent; U.S. Patent No. 6,921,985 ("the '985 patent"); U.S. Patent No. 6,879,055 ("the '055 patent"); U.S. Patent No. 7,629,705 ("the '705 patent"); and U.S. Patent No. 7,321,221 ("the '221 patent").

## JURISDICTION AND VENUE

19.    Jurisdiction over Mitsubishi's claims under the Sherman Act and the Lanham Act is proper under 28 U.S.C. §§ 1331 and 1337(a). Jurisdiction over Mitsubishi's state law claims is proper under 28 U.S.C. § 1367(a) and the principles of supplemental jurisdiction.

20.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 in that this is an action between citizens of different states and the amount in controversy exceeds $75,000 exclusive of costs and interest.

21.    Defendant GE is subject to personal jurisdiction because GE has a registered agent for service of process in Arkansas and conducts business in this State.

22.    Venue is proper in this judicial District pursuant to any one or more of the following statutes:  28 U.S.C. § 1391, 15 U.S.C. § 15, or 15 U.S.C. § 22. Defendant GE transacts business or is found in this District.  Also, a substantial part of the events giving rise to the claims were intended to cause effects in this District.

## I.      The Relevant Market

### A.      The Relevant Product Market

23.    The relevant product market is variable speed wind turbines.

24.    Variable speed wind turbines are electricity-generating windmills outfitted with power converters that allow them to operate over a wide range of wind speeds when connected to a power grid transmission system.

25.    The vast majority of variable speed wind turbines are purchased and installed as part of large facilities.  Such facilities, often known as "wind farms,"

generate electric power for transmission over a power grid to be sold, ultimately, to consumers of electricity.

26.   Fixed speed wind turbines are not part of the relevant market.  From the purchasers' perspective, fixed and variable speed wind turbines are not interchangeable products for several reasons.

27.   *First*, fixed and variable speed wind turbines have distinct characteristics and capabilities.

28.   Fixed speed wind turbines rotate at a nearly constant speed designed to generate power at the single frequency required by the power grid.  When wind conditions would cause a fixed speed wind turbine to rotate either too slowly or too quickly to produce electricity at the frequency required by the grid, the fixed speed turbine must be taken off-line.  As a result, fixed speed wind turbines can provide their output to the grid only when wind speeds are within a relatively narrow range.

29.   In contrast, variable speed wind turbines can generate power at the required grid frequency despite rotating at different speeds.  They can therefore generate electricity over a much wider range of wind speeds.  Variable speed wind turbines capture a significantly larger fraction of wind energy and generate more saleable electric power due to their ability to operate in a wider range of conditions.

30.    Rapid power fluctuations are less common in variable speed wind turbines than in fixed speed wind turbines, due to the inclusion of technologies not normally found in fixed speed wind turbines.

31.    Variable speed wind turbines have less complex pitch control and can produce less acoustic noise.  This is important for wind farms located in populated regions.  Because of the significant advantages of variable speed wind turbines, the development of variable speed wind turbines is one of the key advances that have made large-scale wind farms economically feasible.

32.    *Second*, fixed and variable speed wind turbines have distinct pricing issues.

33.    Variable speed wind turbines are more expensive than fixed speed wind turbines.  The additional electrical and mechanical components of variable speed wind turbines make their purchase price substantially higher than that of fixed speed products.

34.    However, variable speed wind turbines are more cost-effective because they have greater efficiency:  they can run much more often than fixed speed wind turbines.

35.    *Third*, fixed and variable speed wind turbines have distinct maintenance issues.  For example, variable speed wind turbines suffer from less mechanical stress than fixed speed wind turbines.

36.    *Finally*, there is currently more demand for variable speed wind turbines.

37.    Most current purchasers in the United States prefer variable speed wind turbines over fixed speed products.

38.    Nearly all commercial wind farm projects in the United States installed in 2009 or still under construction at year's end utilized variable speed wind turbines, with at least 1.5 megawatt ("MW") ratings and often much higher.

39.    Thus, variable speed products currently constitute most of the commercial wind turbine sales in the United States.  This trend is expected to continue.

40.    In addition, the relevant product market does not include systems used to generate electric power from sources other than wind such as natural gas-fired, coal-fired, nuclear, hydro-electric, and solar power generation.

41.    From the purchasers' perspective, variable speed wind turbines are not interchangeable with these forms of electric power generating systems.  These systems depend upon entirely different sources of energy and raise different environmental concerns.

42.    The power output from gas and coal turbines can be adjusted at will, but a wind turbine does not provide that capability.  Wind farms also require large tracts of land, whereas gas turbine facilities generating comparable amounts of

electric power can be built on much smaller pieces of land. State and federal laws and regulations encourage wind-power generation through standards and tax credits. *E.g.*, American Recovery and Reinvestment Act of 2009, Pub. L. 111-5 (Feb. 17, 2009). These regulatory initiatives make wind turbines non-interchangeable with other forms of electric power generation in the eyes of purchasers.

43.    Industry participants recognize a separate market for variable speed wind turbines. For example, wind turbine manufacturers GE, Gamesa and Siemens distinguish fixed and variable speed turbines in their marketing materials based on the different merits.[1] GE's complaint in the ITC proceedings sought protection for a domestic industry that makes products defined as "variable speed wind turbines and components thereof." GE Complaint in ITC Investigation, at ¶ 18.

### B.    Relevant Geographic Market and Barriers to Entry

44.    The relevant geographic market is the United States of America.

45.    Several factors separate the U.S. market from other geographic regions.

---

[1] *See, e.g.*, Siemens website at http://www.energy.siemens.com/hq/en/power-generation/renewables/wind-power/wind-turbines/ (last visited May 17, 2010) (identifying the different wind turbine products – fixed and variable speed – and explaining the advantages and disadvantages to each).

46.    Because of the size and weight of variable speed wind turbines – an erected Mitsubishi 2.4 MW turbine stands a football field high – their importation into the United States entails high transportation costs not incurred for domestically produced products.  International transportation costs alone amount to over 20% of the price of a comparable turbine manufactured in the United States, without taking into account any import duties.

47.    The high cost of transporting variable speed wind turbines into the United States not only segregates the U.S. market from those abroad, but also presents a formidable barrier to entry into the U.S. market by would-be new sellers.

48.    To avoid or reduce those transportation costs, several market participants with foreign manufacturing sources, including Mitsubishi, have made large capital investments to develop assembly facilities for wind turbine nacelles, the turbine's principal mechanical component, for variable speed wind turbines in the United States.

49.    A new turbine assembly facility in the U.S. for just the nacelle component of the variable speed wind turbine can carry a price tag in excess of $100 million.

50.     The capital outlays required at start-up, coupled with the lead time until production of saleable units, create further barriers to entry into the U.S. market.

51.     The high transportation costs associated with shipping nacelles from Japan to the United States led to Mitsubishi's decision to build a nacelle manufacturing facility at Fort Chaffee.  This facility will be MPSA's manufacturing headquarters for variable speed wind turbines deployed throughout the United States.  Mitsubishi expects to spend over $100 million on this project. Mitsubishi has made and will continue to make substantial investments in this facility in the expectation of stopping GE's anticompetitive scheme, but the value of these investments will be lost if GE succeeds at killing demand for the plant's output.

52.     Also separating the United States from other geographic markets are different regulatory requirements that force manufacturers to build variable speed wind turbines for the United States with different technology.

53.     For instance, the United States has different code and electric standard requirements than those that apply in Europe.

54.     Manufacturers design and build variable speed wind turbines for specific wind farm projects, taking into account, among other factors, whether the wind farm project is located in Europe, the United States, or another market.

14

55.   Foreign manufacturers thus face the increased costs of building and operating separate manufacturing facilities to make variable speed wind turbines for one geographic market or the other, or must forego sales of models designed for other markets, e.g., Europe, when they reconfigure facilities for production runs dedicated to U.S.-mandated designs.

56.   A further factor separating the United States market from others is the need for a new manufacturer to have a demonstrated track-record with respect to product reliability and service in the United States.

57.   Wind farm projects require significant up-front investments, financed by loans.  The lenders rely on projected revenues from the wind farm's electric power sales over many years.  Because planned and unplanned downtimes directly reduce revenue and increase costs, developers and lenders require extensive due-diligence and a demonstrated track-record of reliability of the specific wind turbine model in the project's wind and other conditions.

58.   Consequently, the reliability of the manufacturer and the specific wind turbine model in the proposed wind regime are viewed by developers and lenders as a vital component of every wind project.

59.   The prevailing patterns of wind and other operating conditions often differ significantly from one geographic region to another.  Thus, in the market for variable speed wind turbines, the suggestion that a manufacturer lacks a successful

operating track record in the relevant U.S. wind regime represents a significant barrier to entry.

60.    GE's improper efforts to enforce patents, including fraudulently obtained patent rights, within the United States constitute an additional factor separating the U.S. market from other regions, as well as a barrier to entry.

61.    Issued and only effective within the United States, these patents cordon the United States from the rest of world by imposing additional costs and conditions on manufacturers wishing to sell in the United States.

62.    GE's assertion in the United States of just one patent–the '039 patent–has slowed the development of wind turbines in the United States as compared to the European Union, where GE was forced to withdraw the counterpart patent.

63.    The targets of GE's infringement actions are confronted with higher costs and market-place uncertainties created by potential GE litigation, paying GE for a license, or inventing around asserted patents (if that is possible at all).

64.    Competitors also face disruption of their own sales during the pendency of the litigation.

65.    There is a consensus in the industry that the U.S. market exists separate and distinct from variable speed wind turbine markets in other geographic areas.

66.    GE itself has, in its amended complaint before the ITC, argued that the U.S. market is distinguishable for commercial or "utility scale" variable speed wind turbines.

67.    The effect of the barriers segregating the U.S. market from others is also seen in the dramatic difference in GE's shares of these markets.  In terms of number of wind turbine installations, GE's market share in the U.S. is more than *30 times larger* than its miniscule market share in Europe.

68.    To a great extent, the dominant market share of GE in the United States, which has remained stable for many years and is in stark contrast to its market share outside the United States, is the result of its anticompetitive conduct in this market.

## C.    GE's Market Dominance

69.    GE dominates the relevant market for variable speed wind turbines in the United States with sufficient market power for monopolization or, in the alternative, a dangerous probability of success in achieving monopoly power in this market.

70.    This market power is reflected, in part, in its dominant market share. For instance, based on data reported by the American Wind Energy Association ("AWEA"), GE itself accounted for more than 70% of the variable speed wind

turbine units installed in the United States in 2009, without taking into account installations of units from manufacturers under license from GE.

71.     The high transportation costs for imports, GE's own tenuous U.S. patent claims, regulatory and consequent technological and manufacturing differences, and the need for a strong reputation and track-record of high reliability in the United States, constitute formidable barriers to any GE competitors seeking to enter the U.S. market for variable speed wind turbines.

72.     In addition to GE's dominant market share and the barriers to entry, GE exercises the power to exclude competition and to raise prices directly.

73.     As alleged above, since GE initiated its ITC complaint for patent infringement against Mitsubishi, Mitsubishi has not made any new sales of variable speed wind turbines.

74.     Moreover, GE's anticompetitive patent enforcement practices have forced several competing manufacturers to obtain licenses to some or all of GE's asserted patents.  These licenses have burdened them with increased costs to manufacture and sell variable speed wind turbines in the United States.

75.     Referring to the reputation of GE's 1.5 MW product as "the industry standard," GE admitted in its ITC complaint dated February 2008 that "[t]his phenomenon is not only the result of GE's activities in the United States but also those of its numerous licensees of the '039 and '985 patents."

76.     Based on public licensing announcements, companies licensed by GE have sold a substantial portion of the variable speed wind turbines that were installed in the United States in 2009 and were not manufactured by GE.

77.     The terms of GE's licenses to other manufacturers have not been announced publicly.

78.     GE's offers to license its wind-related patents to Mitsubishi have been on unreasonable and anticompetitive terms.  These terms have included:

(a)     an exorbitant $500 million up-front fee with a cap up to the total nameplate capacity permitted to be sold by Mitsubishi in the United States, and

(b)     a comparable per megawatt royalty based on the rated capacity of wind turbines manufactured and/or sold in the United States over and above the cap.

79.     The up-front license fee demanded by GE alone would represent nearly 50% of the contract sales price for the Mitsubishi variable speed wind turbines that would have been sold under the cap.

80.     These terms would not only directly limit the amount of competitive sales but would also impose additional costs, not borne by GE products, on rival manufacturers and, indirectly, on their customers.

81.     High licensing fees also enable GE to reap the benefits of monopolizing variable speed wind turbines without having to manufacture and sell all of the units themselves.

82.    If left unchecked, GE's anticompetitive patent enforcement and licensing practices create a dangerous probability of maintaining or achieving monopoly power in the U.S. market for variable speed wind turbines.

## II.    GE's Anticompetitive Conduct

83.    GE implemented an unlawful anticompetitive scheme to exclude Mitsubishi from the U.S. market and to intimidate other manufacturers.  This unlawful scheme has four related components, each by itself anticompetitive and each contributing to the exclusionary effects of the whole.

### A.    GE's Attempts to Pressure Mitsubishi into Entering into Disadvantageous License Agreements

84.    GE's attack on Mitsubishi first began with an attempt to pressure Mitsubishi into signing license agreements that would put it at a competitive disadvantage in the United States.

85.    GE Wind Energy's intellectual property counsel sent to Mitsubishi representatives letters dated June 15, 2005, July 11, 2006, March 15, 2007, June 20, 2007, July 3, 2007, and July 30, 2007.  These letters were sent via the U.S. Postal Service or by private or commercial interstate carrier ("the mails") or electronically.  Each letter represented that GE had valid, enforceable patents that were infringed by Mitsubishi's variable speed wind turbines.  Each letter demanded that Mitsubishi enter into license agreements whereby Mitsubishi would have to pay exorbitant license fees and accept anti-competitive restrictions.  While

at one point GE listed 11 patent families, none of these letters explained how GE

believed Mitsubishi's turbines infringed its patents or even what "claims" under

any patent were infringed.  In essence, they were demands that Mitsubishi pay GE

or else face the consequence that GE would sue them for unspecified reasons.

     86.    On at least 17 separate occasions between May 2007 and February

2008, GE Wind Energy's intellectual property counsel transmitted emails to

various employees of Mitsubishi – including MPSA's Associate General Counsel,

MHI's Patent Group Manager, Intellectual Property Department, and MPSA's

Vice President Commercial Operations, Wind Turbine Group.  These emails

similarly represented that GE had valid patents upon which Mitsubishi was

infringing.  These emails demanded that Mitsubishi enter into disadvantageous

license agreements.  None of these emails explained how GE believed Mitsubishi's

turbines infringed its patents or even what patent claims were infringed.

     87.    On at least 6 separate occasions between April 2007 and June 2007,

various GE representatives – including representatives from GE Infrastructure of

GE Energy as well as GE Energy's Commercial Leader Latin America –

transmitted emails to various employees of Mitsubishi.  These emails pressed GE's

licensing demands against Mitsubishi.  None of these emails explained how GE

believed Mitsubishi's turbines infringed its patents or even what patent claims

were infringed.

88.     Mitsubishi responded by making a detailed presentation to GE on October 14, 2007, explaining in detail why Mitsubishi did not infringe the GE patents.  At the time, Mitsubishi was not aware that GE's patents had been fraudulently obtained and assumed they were valid.

89.     GE did not respond to the presentation by explaining how GE believed Mitsubishi's turbines infringed its patents or even what patent claims were infringed.  Indeed, GE did not substantively respond to Mitsubishi until February 27, 2008, when, without any prior warning to Mitsubishi representatives, GE initiated litigation for patent infringement.

## B.     GE's Sham Litigation

90.     Having failed in its attempt to intimidate Mitsubishi into signing a license without explaining why, GE filed and maintained baseless lawsuits against Mitsubishi for infringing patents relevant to variable speed wind turbines.  This was the first time that GE specified any patent claims it argued were being infringed.

91.     On February 27, 2008, GE filed a complaint at the ITC against Mitsubishi, accusing the company of infringing two patents:  the '039 patent and the '985 patent.  On July 31, 2008, GE filed a second amended complaint to allege infringement of a third patent:  the '221 patent.  GE alleged that Mitsubishi's 2.4 MW variable speed wind turbine model directly infringed all three of these patents

22

and, therefore, that the importation of these wind turbine models violated Section 337 of the Tariff Act, 19 U.S.C. § 1337.

92.     On September 3, 2009, GE filed a complaint for patent infringement against Mitsubishi in the U.S. District Court for the Southern District of Texas, Corpus Christi Division.  GE's complaint alleged that Mitsubishi's 2.4 MW wind turbine model infringed GE's '039, '985, and '221 patents.  This litigation was stayed pursuant to 28 U.S.C. § 1659(a) pending a final resolution of the issues raised before the ITC on the same three patents.

93.     On January 8, 2010, the ITC issued a notice terminating its investigation on the '039, '221, and '985 patents with a final determination of no violation.  The ITC found that, under a proper construction of the claims, GE itself did not use any of the three asserted patents in its own wind turbines.  The ITC went on to consider GE's infringement claims on only two of the three patents (the '039 and '221 patents) and determined that the Mitsubishi wind turbine did not infringe either of those patents.

94.     Vindicated regarding GE's patent infringement allegations, Mitsubishi looked forward to returning to the U.S. variable speed turbine market.

95.     But GE's persistent failure to specify what patent claims it had against Mitsubishi throughout the pre-litigation period had a purpose:  GE wished to leave itself the option of concocting new patent litigation against Mitsubishi – and

23

prolonging the barrier to Mitsubishi's entry – each time GE lost a suit on a series of patents.

96.     On February 11, 2010, GE filed a new complaint for patent infringement against Mitsubishi in the U.S. District Court for the Northern District of Texas, Dallas Division.  This GE complaint alleged that Mitsubishi's 2.4 MW wind turbine model infringed two other GE patents not mentioned in the ITC proceedings:  the '055 patent and the '705 patent.  GE had never before notified Mitsubishi that Mitsubishi's variable speed turbines violated these patents or which claims of the patents were infringed.

97.     As GE filed this complaint, it also issued a press release stating that "there are multiple areas where MHI's 2.4 megawatt wind turbines infringe on GE's existing patents."  This was intended to lead actual and potential customers to believe that GE would keep the cloud over Mitsubishi's products through a campaign of patent infringement suits on as yet unspecified claims of infringement.

98.     GE continues to prosecute its claims of infringement of the '055 and the '705 patents against Mitsubishi in the U.S. District Court for the Northern District of Texas.

99.    GE filed and maintained each one of these complaints in bad faith. GE knew that the patents at issue could not support valid, enforceable claims of patent infringement against Mitsubishi.

## The '039 Patent

100.    The PTO issued the '039 patent to U.S. Windpower Inc. in 1992. Enron Corporation later purchased the '039 patent.  In 2002, GE acquired the '039 patent from the Enron bankruptcy estate.

101.    According to GE, claim 121 of the '039 patent covers any variable speed wind turbine using a "doubly-fed induction generator ("DFIG") with an "inverter-based" power converter.

102.    However, GE knew that claim 121 of the '039 patent was invalid because of GE's own prior art.  GE nevertheless sought to use claim 121 of the '039 patent to stifle competition by (1) asserting a patent claim which it knew was made invalid by GE's own publications on its work in the 1980s and (2) pursuing a construction of that claim that was invalid in light of GE's own, undisclosed prior art in an attempt to sweep Mitsubishi's wind turbines improperly within the patent's scope.

103.    In essence, GE was trying to enforce a patent on the idea of using a DFIG with inverter-based power converter in a wind turbine.  But GE had ample reason to know that this was not an original idea.

25

104.   The very same technology that GE contends is covered by claim 121 is evident from a 1984 report prepared by GE as part of a federally-funded research program.

105.   In July 1980, the U.S. government hired GE, under contract DEN 3-153, to design and build the so-called "MOD-5A" wind turbine generator.  The MOD-5A program was financed by the U.S. Department of Energy ("DOE") and administered by the National Aeronautics and Space Administration ("NASA") under the Federal Wind Program created in 1980.  *See* Pub. L. 96-345 (Sept. 1980) (codified at 42 U.S.C. § 9201, *et al.*).  Congress later authorized paying GE an additional $9 million from taxpayer money for the completion of the MOD-5A. *See* H.R. Cong. Rep. 97-208, 1981 U.S.C.C.A.N. 1010, 1188 (1981).

106.   The MOD-5A program lasted over three years.  GE issued press releases about the program.  GE's employees at the time, including Robert S. Barton, prepared interim reports on the MOD-5A project.  In May 1984, GE's Walter C. Pijawka prepared a report on the status of the MOD-5A project at a DOE/NASA workshop in Cleveland, Ohio.

107.   In August 1984, GE published its final report to document the design, development, and analysis of the MOD-5A system under the federal program. This report was entitled MOD-5A Wind Turbine Generator Program Design

Report ("the 1984 DOE Report").  It is 5,311 pages long and divided into four volumes.

108.   Volume 3 of the 1984 DOE Report describes the final design of the MOD-5A chosen by GE.  In Volume 3, GE explains that it had considered alternative designs for providing variable speed capability, including a design with a wound rotor induction motor ("WRIM") – of which a DFIG is an example – in combination with an inverter based power converter, just as GE contends is covered by claim 121 of the '039 patent.  (In simple terms, an inverter converts direct current to alternating current.  An example of an inverter is the device that one plugs into an automobile's cigarette lighter socket to be able to provide power to electrical equipment normally plugged into a wall outlet, such as an electric shaver, portable television, or laptop computer.)  That design ultimately was not adopted as the final design for the MOD-5A but it was clearly disclosed in GE's final report to DOE and NASA.

109.   In addition, the 1984 DOE Report prepared by GE included a diagram of four alternative approaches to providing variable speed capability.  That diagram is reproduced below:



- **MECHANICAL SCHERBIUS SYSTEM**
  AUXILIARY GEAR DRIVE/1.2 MVA/CCI/SCIM
  7.5 MVA SYNCHRONOUS
  0-15%, 85-115% OF SYNCHRONOUS SPEED

- **STATIC SCHERBIUS SYSTEM**
  6.3 MVA 6-8 POLE WRIM (STATOR)/1.5 MVA (ROTOR)
  1.5 MVA 6 PULSE CYCLOCONVERTER ON GROUND
  0-20%, 80-120% OF SYNCHRONOUS SPEED

- **STATIC KRAMER SYSTEM**
  5.0 MVA 8 POLE WRIM (STATOR)/3.0 MVA (ROTOR)
  3.0 MVA 6 PULSE LCI CONVERTER ON GROUND
  100-140% OF SYNCHRONOUS SPEED

- **LCI SYSTEM**
  7.5 MVA 6 POLE SYNCHRONOUS/DOUBLE WINDING
  7.5 MVA 12 PULSE LCI CONVERTER ON GROUND
  0-105% OF SYNCHRONOUS SPEED

(1984 DOE Report, Vol. 3, Book 2, p. 8-1).

110.   In the parlance of patent law, the 1984 DOE Report thus constitutes "material prior art" for claim 121 of the '039 patent.  A skilled artisan – and GE has many skilled artisans – would have known, for example, that the disclosed technology of a WRIM in combination with an LCI converter could be used to supply electricity at a desired angle between voltage and current, just as later required by claim 121 of the '039 patent.  GE's own contemporaneous U.S. Patent Nos. 4,517,635 and 4,562,396, for example, explain that the "LCI" and "CCI" are types of inverters referenced in the diagram reproduced above.

111.   The 1984 DOE Report was not disclosed to the Patent and Trademark Office during examination of the patent application that gave rise to the '039

28

patent.  But for the nondisclosure of the 1984 DOE report, claim 121 of the '039 patent would not have been issued.

112.   The 1984 DOE Report also cites to an earlier report by a former GE engineer that is yet another piece of material prior art known to GE.  Specifically, the 1984 DOE Report cites to a study by T.A. Lipo, entitled *Investigation of Variable Speed for Wind Turbine Power Generation* (University of Wisconsin-Madison, Aug. 1981).  The 1981 Lipo Report discloses a doubly-fed induction generator (DFIG) with load commutated DC current link rectifier-inverter, as shown in the figure reproduced below.



113.   In other words, the 1984 DOE Report was not even the first public disclosure of a wind turbine design involving a DFIG with an inverter-based power converter and GE had been aware of the prior disclosure.

114.   The 1981 Lipo Report also constitutes material prior art to claim 121 of the '039 patent.  The 1981 Lipo Report was not disclosed to the Patent and Trademark Office during examination of the patent application that gave rise to the '039 patent.  But for the nondisclosure of the 1981 Lipo Report, claim 121 of the '039 patent would not have been issued.

115.   GE had no reasonable basis for seeking enforcement of claim 121 of the '039 patent in light of its knowledge of its own prior 1984 DOE report concerning related subject matter.

116.   In the ITC proceedings, GE failed to produce its own 1984 DOE Report to Mitsubishi despite specific discovery requests that encompassed it.

117.   On December 29, 2008, Mitsubishi served on GE its Fourth Set of Requests for Production of Documents in the ITC proceedings requesting, among other things:

> All documents relating to any variable speed wind turbines that GE tested, evaluated, designed or developed (whether commercialized or not), prior to February 22, 1991 (*including the MOD-5A*) including but not limited to documents relating to:
>
> a.     any and all methods used, evaluated, or tested for variable speed control of the wind turbine;
>
> b.     the power converter, power converter controller, and any component used to convert the power generated by each such wind turbine into fixed frequency power;
>
> c.     the circuit topology, structure or design of the power converter, power converter controller, or any

component used to convert the power generated by each
such wind turbine into fixed frequency power;

d.      the operation of the power converter, power
converter controller, or any component used to convert
the power generator by each such wind turbine into fixed
frequency power; and

e.      any prototypes, models, or demonstrations of any
such variable speed wind turbine.

Fourth Set of Requests for Production of Documents, at ¶ 153 (emphasis added).

118.   On January 8, 2009, GE filed its response and objections to

Mitsubishi's Fourth Set of Requests for the Production of Documents.  GE did not

produce its own 1984 DOE Report to Mitsubishi.

119.   On December 29, 2008, Mitsubishi served on GE its Fourth Set of

Interrogatories in the ITC proceedings asking for, among other things:

Identify all variable speed wind turbines that GE and/or
its predecessors in interest tested, evaluated, designed or
developed (whether commercialized or not), prior to
February 22, 1991 *including the MOD-5A*, and for each
such variable speed wind turbine, identify:

a.      any and all mechanisms or methods used,
evaluated, or tested for variable speed control of the wind
turbine;

b.      the manufacturer and model name/number of the
power converter, power converter controller, and other
components used to convert the power generated by each
such wind turbine into fixed frequency power;

c.      the circuit topology, structure or design of the
power converter, power converter controller, or other

> components used to convert the power generated by each
> such wind turbine into fixed frequency power;
>
> d.       the three persons with the most knowledge of each
> such variable speed wind turbine, power converter,
> power converter controller, or other components used to
> convert the power generated by each such wind turbine
> into fixed frequency power (including the title, position,
> and company of each person).

Fourth Set of Interrogatories, at ¶ 117 (emphasis added).

120.   On January 8, 2009, GE filed its response and objections to

Mitsubishi's Fourth Set of Interrogatories.  GE did not identify its own 1984 DOE

Report.

121.   After the ITC proceedings had concluded and GE filed yet another

patent infringement lawsuit in February 2010, Mitsubishi initiated its own

investigation that independently discovered the 1984 DOE Report and the 1981

Lipo Report.

122.   The 1984 DOE Report is even more clearly undisclosed prior art with

respect to the broad construction of claim 121 of the '039 patent that GE advanced

in the ITC proceedings.  In claim 121, the '039 patent uses the phrase "inverter

controller means."  If this phrase was limited to the inverter controller taught in the

specification of the '039 patent, and equivalents thereof, it would cover only a so-

called "squirrel cage" induction generator ("SCIG").  As recognized by the ITC,

Mitsubishi would not infringe claim 121 under this claim construction.  To create

its sham infringement claim, GE advocated a broader construction, covering a DFIG, because it would potentially cover Mitsubishi's wind turbines.

123.    Ironically, the 1984 DOE Report, which was not disclosed to the ITC or Mitsubishi, involved DFIG as well as SCIG generators.  GE proceeded in bad faith when GE asserted a claim construction that clearly would have rendered claim 121 invalid if GE had disclosed the information regarding DFIG generators in the 1984 DOE Report and the 1981 Lipo Report.

124.    GE's bad faith in its broad construction of claim 121 is also reflected by GE's loss of the "counterpart" European patent, No. EP 0 569 556 B1 ("EP '556 patent").  Notably, the European claim – claim 1 of the EP '556 patent – had more limitations and thus was actually narrower than claim 121 of the '039 patent granted in the United States.

125.    Companies in the European wind power industry brought proceedings there opposing the EP '556 patent.  They obtained an initial decision that claim 1 of the EP '556 patent was invalid in view of prior art.  On appeal, that decision was vacated and remanded on technical evidentiary grounds.  But on October 18, 2007, with the opposition proceedings still ongoing, GE's patent attorney informed the European Patent Office that "the proprietor of the patent, General Electric Company, has no longer interest in its European Patent No. 0569556" and that "it

is irrevocably requested that the patent EP 0569556 is revoked in its entirety."

GE's EP '556 patent was completely revoked.

126.   GE filed its ITC complaint based on claim 121 of the '039 patent four months later.

## C.   GE's Wrongful Conduct in the Prosecution of Four Patents in the PTO And Sham Litigation On Those Patents

127.   GE also engaged in fraudulent conduct before the PTO in the prosecution of the other four patents it has asserted – the '221, '985, '055, and '705 patents.  As a result, all four of these GE patents are unenforceable.

128.   Despite GE's knowledge that these four patents were procured through fraud and thus unenforceable, GE in bad faith commenced and maintained multiple patent infringement suits against Mitsubishi based on these patents.

### The '221 Patent

129.   The grid normally operates within a relatively narrow voltage range, but sometimes the grid voltage drops.  If the components in a wind turbine with an "induction" generator are not disconnected during such drops, the turbine's electrical components can be damaged, so a protective circuit cuts the components. The '221 patent describes methods for turning off such protective circuits, allowing the turbine to go back to normal operation.

130.   In Europe, the German transmission system operator E.ON Netz GmbH, had developed a methodology for wind turbine generators' connection to

the grid ("high-voltage network"), i.e., that wind turbines are required to remain connected to the grid during certain faults with no automatic separation of a wind turbine from the grid unless the grid voltage lies outside of a specified range. On December 1, 2001, E.ON issued rules implementing this methodology known as "the E.ON standard." Included in the E.ON standard for interconnection of wind power systems is a Figure 4a, reproduced below at bottom, that specifies voltage drops (e.g., grid faults) for which ride through is required for the wind turbine.

131.   GE filed an application for the '221 patent in the U.S. on July 17, 2003 that intentionally withheld the existence of the E.ON standard. As explained below, the E.ON standard is material prior art to the '221 patent, which deals with the very same subject matter. GE was obligated under federal patent law to disclose it. Yet, when filing this application, GE *intentionally removed* reference to the E.ON standard that had appeared in GE's own prior German patent application. This constituted fraud on the PTO.

132.   Before the PTO, GE claimed priority back to the filing of a German patent application on July 17, 2002 pursuant to a patent-related treaty. Because the E.ON standard is well-known in Germany, the German application contained a Figure 2 (reproduced below at top) with a caption that identifies "E-ON."

**Fig. 2**



Bild 4a  Spannungstrichter Pkt. 2.6 der E-ON Forderungen





Bild 4a: Verhalten bei Störung im Netz

133.   Yet, when GE submitted its application for the '221 patent in the U.S., GE made no reference to the known E.ON standard.  In fact, GE included a Figure 2, reproduced at center – with the very same graphics as in the German priority application – but with text translated into English and *without the E.ON caption.*

36

In other words, GE intentionally removed reference to the E.ON standard that had appeared in its own German patent application.

134.   The E.ON standard was recently disclosed to the PTO in connection with a request for reexamination of the '221 patent.

135.   On February 26, 2010, the PTO ordered reexamination of all of the claims of the '221 patent stating that  "E.ON presents new technological teachings . . . not considered during prosecution of the '221 patent," that "a reasonable examiner would consider evaluation of the above teachings as important in determining the patentability of the claims," and that there is "a substantial new question of patentability . . . which question has not been decided in a previous examination of the '221 patent."

136.   The '221 patent is unenforceable for a second reason, also known to GE.

137.   On June 26, 2003 – roughly one month before it filed its application for the '221 patent – GE filed an application for a separate patent (U.S. Patent No. 7,289,920) ("the '920 application"), entitled "Method and Apparatus for Capture of Grid Characteristics Corresponding to Fluctuation Events."

138.   The same law firm represented GE with respect to both the '920 and '221 patent applications.  The two applications were pending at the same time, but before different examiners at the PTO.

37

139.   During the prosecution of the '920 application, prior art U.S. Patent No. 6,215,202 ("the '202 patent") was cited.  The '202 patent disclosed a switch to disconnect the energy storage unit from the grid during a severe voltage sag or outage and reconnecting based on input from sensors monitoring the grid.

140.   GE knew the invaliding effect of this prior art (the '202 patent) on claim 1 of the '221 patent, which concerns a method of operating a wind turbine. The PTO would not have issued claim 1 of the '221 patent, initially asserted at the ITC against Mitsubishi, had GE disclosed the E.ON standard or the '202 patent.

141.   The materiality and GE's knowledge of the '202 patent were discovered through an investigation that occurred subsequent to the filing and grant of the reexamination request for the '221 patent.

### The '985 Patent

142.   All modern wind turbines must also have the ability to "ride through" a low voltage event on the grid.  This means that the control systems of the turbine must remain operational during periods of decreased grid voltage, so that the turbine can continue to convert wind energy to electrical energy and support the return of normal voltage to the grid.  In 2005, the Federal Energy Regulatory Commission ("FERC") specifically imposed this requirement on all large wind turbines entered into service after December 31, 2007.  FERC explained that as wind power takes on a greater share of national generating capacity, it is no longer

acceptable for wind turbines to trip off-line during low voltage events. Like other sources of generation, they must remain online to support the reliability of the grid.

143.   To successfully "ride through" a low voltage event, the control systems of a wind turbine – indeed, of any turbine – must have a source of power other than power from the grid. Claim 15 of the '985 patent refers to the use of an "uninterruptible power supply," e.g., a battery, for this purpose.

144.   GE filed its application for the '985 patent on January 24, 2003. Federal law requires each patent applicant to certify the names of all inventors of the innovation on which a patent is sought. Yet GE knowingly failed to include one of the inventors of the '985 patent in the prosecution of its application, simply because he had not assigned his rights to GE. This constituted fraud before the PTO.

145.   Thomas Wilkins was an inventor of the '985 patent.

146.   The cover sheet to the patent application submitted to the U.S. Patent and Trademark Office on January 24, 2003 identified six (6) inventors, including Thomas Wilkins.

147.   Thomas Wilkins was never an employee of GE. Wilkins refused to sign an employment agreement with GE that included an assignment of his rights as an inventor.

148.   Seven months after filing the application for the '985 patent, on July 31, 2003, GE submitted a declaration which – in contrast to the cover sheet with which GE opened the application – included only five inventors, omitting Thomas Wilkins.  This "Combined Declaration and Power of Attorney for Patent Application" ("Combined Declaration") had 5 counterparts, each with the signature of one of five inventors.  The omission of Thomas Wilkins from the Combined Declaration constituted a false representation that Wilkins was not one of the inventors.  The Combined Declaration is per se material.

149.   GE was aware of its duty to disclose material information when providing submissions to the PTO during the prosecution of a patent application. The Combined Declaration includes an express acknowledgement of the duty of disclosure:  "I acknowledge the duty to disclose information which is material to the examination of this application in accordance with 37 CFR § 1.56."

150.   The contents of the meetings or communications through which GE made its decision to drop Thomas Wilkins as an inventor in the application were never disclosed in the ITC proceedings.  GE had invoked the attorney-client privilege.  Issues of fraud to pierce that privilege were not argued or considered in the ITC proceeding.

151.   GE's withholding of material information in the Combined Declaration was fraud and rendered the '985 patent unenforceable.

152.   GE continued to mislead the PTO by failing to disclose prior art in its application for the '985 patent.  GE has alleged that claim 15 of the '985 patent "teaches the unique incorporation of several elements that allow a wind turbine to continue operating through a severe grid disturbance . . . Elements of the unique combination taught by claim 15 include the use of an uninterruptible power supply to power the wind turbine components when needed."

153.   But GE had described the technology associated with asserted claim 15 in the 1984 DOE Report.  That report plainly included a design in which an "uninterruptible power supply provides power for the instrumentation and controls when utility power is interrupted."  The 1984 DOE Report also disclosed a converter controller coupled with an inverter.  The 1984 DOE Report thus disclosed the very claim limitations—a converter controller coupled to receive power from an uninterruptible power supply—that GE later added to claim 15 to secure allowance.  GE intentionally withheld this reference from the PTO.

154.   GE knew the invalidating effect of its own prior art.  The PTO would not have issued claim 15 of the '985 patent had GE disclosed its 1984 Report.  GE later asserted claim 15 of the '985 patent at the ITC.

155.   Further, GE's U.S. Patent No. 5,907,192 ("the '192 patent"), which issued May 25, 1999, discloses a wind turbine generator with a capacitor providing power to a control system during loss of power.  The '985 patent claim 1

41

specifically claims a blade pitch control system and an uninterruptible power supply that can comprise one or more capacitors.  The '192 patent is prior art to the '985 patent and is material to the patentability of at least claim 1 of the '985 patent.  Yet GE intentionally also withheld the '192 patent from disclosure to the PTO during prosecution of the application for the '985 patent, thereby rendering the '985 patent unenforceable.

156.   GE also stole from the E.ON standard for the '985 patent.  GE copied the curve of Fig. 1 of the '985 patent from the E.ON standard's Fig. 4a discussed elsewhere herein.  Yet GE again failed to attribute the source of this curve for low voltage ride through to E.ON.

## The '055 Patent

157.   As wind turbines of increasing power are developed, the dimensions of the various turbine components and their housing atop the tower also increase.  The sheer size and weight of the turbines create challenges in transport, on-site assembly, and erection.  To this end, the '055 patent relates to providing discrete smaller portions of a wind turbine that are separately installed and then bolted together atop the tower.  Each of the portions is smaller and weighs less than the whole, so as to facilitate transport and assembly.

158.   GE filed an application for the '055 patent on April 19, 2002.  GE knowingly failed to disclose material prior art in that application.  This constituted fraud on the PTO.

159.   The Examiner initially rejected claim 1 of the '055 patent, pursuant to 35 U.S.C. § 102(a), as being anticipated by published European patent application EP 0945613 A2 to Partmann et al. (hereafter "Partmann").  *See* Official Action dated Oct. 16, 2003.

160.   In response to the rejection based on Partmann, GE amended claim 1 of the '055 patent.  This amendment was a limitation on the patent claim that required a base frame with (a) a discrete upper part that carries a drive train and (b) a discrete lower part with an azimuthal drive device attachably joined with the upper part at a connection point.  In layman's terms, the limitations required a two-part turbine frame to be mounted atop the tower.  The upper part of the frame supports the primary operational components of the turbine, while the lower part has the mechanical device to permit the turbine to adjust to the direction of the wind.

161.   GE also distinguished Partmann over the claimed invention by arguing that Partmann is completely silent about having two discrete parts as GE was claiming.

162.   The Examiner allowed claim 1 of the '055 patent based on GE's amendment and representations concerning the novelty of having two discrete parts for the drive train and azimuthal drive.

163.   Unbeknownst to the Examiner, the 1984 DOE Report disclosed the very claim limitations that GE added to claim 1 to secure allowance.  Thus, the 1984 DOE Report was material to the patentability of claim 1 of the '055 patent and GE was obligated to disclose it.

164.   The 1984 DOE Report discloses a variable speed wind turbine design with a two-part base frame, including a discrete upper part having a drivetrain and a discrete lower part having an azimuthal drive device.  The two discrete parts – the yaw subsystem and the nacelle assembly – are bolted to one another.

165.   The 1984 DOE Report was intentionally withheld from the PTO during prosecution of the application giving rise to the '055 patent.  The PTO would not have issued claim 1 of the '055 patent had GE disclosed its 1984 Report.

### The '705 Patent

166.   As noted above, the voltage on the grid at times operates outside of its predetermined, normal voltage range.  And as also noted above, because the power converters and the generator used in wind turbines may be damaged by such grid voltage fluctuations, it is useful to have an automated control system that allows the turbines to "ride through" these voltage anomalies.  That is precisely why, as

44

discussed at ¶ 130 above, E.ON developed its standard for "ride through" and other innovations have been developed to accomplish that goal.  GE's claim 7 of the '705 patent – on which GE is suing Mitsubishi –  started as nothing more than a bald attempt to patent a "low voltage ride-through" control system without telling the Examiner about such prior innovations.

167.   For example, GE itself had filed an international patent application, published in English on January 22, 2004 as WO 2004/008627 ("the WO '627 publication")  The WO '627 publication describes the operation of a wind turbine with "low voltage ride through" capability.  This published application became the basis for GE's '221 patent.

168.   More than a year after the WO '627 publication was published, on October 20, 2006, GE filed the application for what became the '705 patent.  GE withheld both the E.ON standard and the WO '627 publication from the PTO Examiner.  This concealment was intentional, rendering the '705 patent unenforceable under federal law.

169.   Even though the Examiner was not provided with these examples of prior art, he did manage to put together some other publicly available information and from that reached the conclusion that GE's claim 7 should not be granted because it was not an innovation, but instead was "obvious."

170.   To save claim 7, on June 17, 2009, GE amended it.  GE represented to the Examiner that "Independent claim [7] has been amended to include all the recitations of allowable claim 9."  Claim 9 relates to a control system that permits turbines to operate when the grid voltage drops to about zero.  In other words, GE asserted that it sought patent protection only for a control system that would permit operation through both a low voltage period and a zero voltage period.

171.   But GE's changed patent language did not actually implement its assertion.  Despite its clear representation, GE did not include all of claim 9 when it made its amendment.  The effect of GE's claim amendment was that a patent was granted for a control system that permitted operation either during a low voltage event or a zero voltage event.  In other words, GE effectively received a patent claim for the very control system that the Examiner already had found obvious.  The Examiner at the PTO did not catch the sleight of hand.  GE intentionally scammed the PTO about the claim amendment.

172.   In any event, had the Examiner known that the two conditions of new claim 7 were independent – "or" conditions – and that there was material prior art as to one of the two conditions, he would not have allowed the patent claim to issue.  When a claimed control system, as here, is subject to an "at least one" condition, prior art that discloses only one of the two recited situations is sufficient to render the claim unpatentable.  Once GE added the "at least one" requirement to

the claim, the "zero voltage ride through" limitation would have been without significance for purposes of determining patentability if the other condition of the claim (operating outside predetermined voltage range) was found in prior art. GE's own prior art is right on point.

173.   Through the foregoing non-disclosures and misrepresentations, GE obtained claim 7 of Patent '705 on December 8, 2009.  And in February 2010, it deployed this fraudulently obtained patent against Mitsubishi.

### D.      Other Anticompetitive Acts

174.   Before filing the complaints for patent infringement and during its prosecution of those complaints, GE engaged in a publicity campaign intended to interfere with Mitsubishi's business relationships by creating a false and misleading impression that Mitsubishi's  wind turbines infringed valid GE patents.

175.   GE directly threatened Mitsubishi's customers with patent infringement litigation to discourage the purchase of Mitsubishi's wind turbines and foreclose competition.  GE also issued press statements to this effect.  GE knew at the time of these communications that the patents it was alleging Mitsubishi infringed were unenforceable or that the claims were invalid.

176.   On or about January 22, 2007, GE Wind Energy's intellectual property counsel sent a letter to PPM Energy, a customer of Mitsubishi.  The letter stated: "Although as reported in recent press reports, GE has licensed such patents

to a number of wind turbine manufacturers, GE has not licensed such patents to certain other wind turbine manufacturers.  We understand PPM Energy may be considering, or may have purchased, variable speed wind turbines from such unlicensed manufacturers."  GE's letter to PPM Energy enclosed "a listing of patents and applications that GE is willing to consider for licensing" as well as materials about an earlier exclusion order issued by the ITC on the '039 patent.

177.   On or about the time of sending the January 22, 2007 letter to PPM Energy, GE employees visited PPM Energy and purported to explain the patent issue to PPM Energy employees in person.

178.   PPM Energy was so disturbed by GE's representations that PPM Energy demanded indemnification from Mitsubishi in the event GE initiated litigation.

179.   GE made similar statements to Edison Mission Energy ("EME"), a customer of Mitsubishi, through GE Wind Energy's intellectual property counsel and others.  On information and belief, GE threatened to sue EME for patent infringement if EME did not obtain a license agreement from GE for the variable speed wind turbines that it purchased from MPSA.  On March 7, 2008, EME wrote a letter to Mitsubishi, stating that EME had "recently learned" about GE's complaint for patent infringement at the ITC and that "[t]he complaint has raised

concerns at EME regarding the ability of MPSA to perform" under the parties' wind turbine supply agreement.

180.   On April 1, 2010, EME filed an amended complaint against Mitsubishi, seeking rescission of the parties' turbine supply agreement and substantial monetary damages. *See EME v. Mitsubishi*, Case No. 30-2010-00355044 (Calif. Superior Ct. – Orange County).  EME alleged claims of fraudulent inducement, breach of warranty, and breach of the covenant of good faith and fair dealing.  The EME allegations are based, in substantial part, on GE's patent-related litigation before the ITC and two federal courts.

181.   EME's amended complaint also states:

> Moreover, two separate patent infringement suits have recently been filed by GE, involving further infringement claims and associated risks.  *More patent suits are likely to follow as GE has stated that "there are multiple areas where MHI's 2.4 megawatt wind turbines infringe on GE's existing patents," the very turbines purchased by EME.*

EME Amended Complaint, at ¶ 2 (emphasis added).

182.   EME's amended complaint further states that "[t]his three-front patent battle has created a legal quagmire and has rendered the WTG's incapable of deployment at various EME wind power projects because, among other things, EME has been unable to finance projects that use Defendants' WTGs . . .."  EME Amended Complaint, at ¶ 2.

183.   Aside from threatening Mitsubishi's customers, GE has also threatened other competitors with suit to pressure them into signing unfavorable licensing agreements.  GE has strong-armed these competitors into patent license agreements that restrict or inhibit their ability to compete with GE.

184.   For example, on January 7, 2004, Gamesa Eolica, S.A. ("Gamesa") filed a complaint against GE in the U.S. District Court for the Western District of Wisconsin, seeking a declaratory judgment that Gamesa's wind turbines do not infringe GE's patents.  Gamesa's complaint stated:  "GE has asserted that Gamesa needs to obtain a license under the '039, '187, and '795 patents in order to sell Gamesa's variable speed wind turbines in the United States.  * * * GE has stated publicly that it will enforce its patent rights in the courts with regard to variable speed wind turbines."  Gamesa's complaint then explained that GE's tactics and threats – just as in the case of Mitsubishi – created an uncertainty in the marketplace as to Gamesa's ability to fulfill large wind farm projects.

185.   The Gamesa declaratory judgment claim was dismissed for lack of subject matter jurisdiction.  Without immediate relief and recognizing that it could not sell turbines during the pendency of the litigation, Gamesa was forced to enter into a license agreement with GE to enter the U.S. variable speed wind turbine market.

186.   Competitors that GE has similarly pressured into license agreements include:  Americas Wind Energy, Acciona Windpower, EU Energy Inc. (Composite Technology and DeWind), Fuhrlander AG, RePower (subsidiary of Suzlon), AAER, Enercon GmbH, and Gamesa.  GE is aware that its patents are unenforceable or include invalid claims, but decided to engage in a strategy to pressure competitors to enter into licenses for the use of GE's patented technology.

187.   GE has made false or misleading statements to the public about Mitsubishi's wind turbines in the press.

188.   In February 2010, GE's Dan Nelson emailed a prepared statement to the press announcing GE's recent complaint for patent infringement against Mitsubishi in the U.S. District Court for the Northern District of Texas.  The GE statement announced:  "We believe that there are multiple areas where MHI's 2.4-megawatt wind turbines infringe on GE's existing patents."  This prepared GE statement was emailed to multiple media outlets, including the Wall Street Journal and Bloomberg.

189.   GE's threats to Mitsubishi's customers and the public, and its licensing practices evidence a specific intent to monopolize the U.S. variable speed wind turbine market.

51

### III.   <u>Antitrust Injury</u>

190.   GE's unlawful conduct has injured competition in the U.S. market for the sale of variable speed wind turbines.  Purchasers have been deprived of a free, unfettered competitive market for variable speed wind turbines.

191.   Mitsubishi is an actual competitor in the relevant market affected by GE's anticompetitive conduct.  Mitsubishi has suffered injury as a result of GE's conduct, including the loss of actual and potential customers, lost profits, and the loss of good will.  Since GE's ITC complaint was filed over two years ago, Mitsubishi has not sold a single variable speed turbine.  GE has deprived Mitsubishi of the opportunity to freely compete in the marketplace with GE.

### <u>FIRST CLAIM FOR RELIEF</u>
### (SHAM LITIGATION TO MONOPOLIZE IN VIOLATION OF 15 U.S.C. § 2)

192.   Plaintiffs repeat and incorporate the factual allegations of paragraphs 23-82, 90-126, and 190-91 as if set forth here in full.

193.   There is a relevant market for the sale of variable speed wind turbines in the United States.

194.   GE has monopoly power in the relevant market.

195.   GE has filed and maintained sequential objectively baseless lawsuits for patent infringement without any good-faith belief that GE could prevail in the litigation and with the subjective intent of preventing, impeding, or delaying Mitsubishi's entry into the relevant market.

196.   GE's sham litigation has occurred in, and is having a substantial effect on, interstate commerce.

197.   GE's sham litigation has injured and will continue to injure consumers and competition in the relevant market.

198.   As a direct and proximate result of GE's sham litigation, Mitsubishi has been injured and has sustained damages.  Mitsubishi will continue to sustain predictable damages in the future.  Unless the activities complained of are enjoined, Mitsubishi will suffer immediate and irreparable injury for which Mitsubishi has no adequate remedy at law.

199.   As a direct competitor that was targeted by GE's sham litigation, Mitsubishi has standing to bring this claim.

200.   Mitsubishi is entitled to recover for its damages under Section 2 of the Sherman Act, 15 U.S.C. § 2.  Mitsubishi is also entitled to a permanent injunction restraining GE from engaging in the sham litigation.

## SECOND CLAIM FOR RELIEF
### (OVERALL SCHEME TO MONOPOLIZE IN VIOLATION OF 15 U.S.C. § 2)

201.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

202.   There is a relevant market for the sale of variable speed wind turbines in the United States.

203.   GE has monopoly power in the relevant market.

204.   GE has taken affirmative exclusionary acts to acquire and maintain its monopoly power in the relevant market.

205.   GE has willfully engaged in a pattern and practice of exclusionary conduct in furtherance of its overall scheme to monopolize, including but not limited to:

a.   The filing and maintenance of sham patent infringement actions on the '039 patent;

b.   Obtaining four other patents through fraud on the PTO and threatening and filing sham litigation based on those patents against Mitsubishi and other manufacturers despite knowing that the patents were fraudulently obtained;

c.   Publicly threatening sequential sham litigation on unspecified patent claims that would disrupt its competitors' ability to sell in the United States market;

d.   Entering into licensing arrangements based on fraudulently-obtained patents; and

e.   Threatening past and prospective purchasers, including Mitsubishi customers, to discourage the purchase of variable speed wind turbines from competitors of GE not licensed by it, including Mitsubishi.

206.   The foregoing acts and the continuing course of GE's anti-competitive conduct have harmed and threaten to continue to harm consumers and competition in the relevant market.

207.   GE undertook these acts with the intent to acquire and maintain its monopoly power in the relevant market.

208.   GE's conduct has occurred in, and is having a substantial effect on, interstate commerce.

209.   As a direct and proximate result of GE's exclusionary and anticompetitive conduct, Mitsubishi has been injured and has sustained damages. Mitsubishi will continue to sustain predictable damages in the future.  Unless the activities complained of are enjoined, Mitsubishi will suffer immediate and irreparable injury for which Mitsubishi has no adequate remedy at law.

210.   As a direct competitor that was targeted by GE's anticompetitive conduct, Mitsubishi has standing to bring this claim.

211.   Mitsubishi is entitled to recover for its damages under Section 2 of the Sherman Act, 15 U.S.C. § 2.  Mitsubishi is also entitled to a permanent injunction restraining GE from engaging in the anticompetitive acts.

### THIRD CLAIM FOR RELIEF
#### (SHAM LITIGATION TO ATTEMPT TO MONOPOLIZE IN VIOLATION OF 15 U.S.C. § 2)

212.   Plaintiffs repeat and incorporate the factual allegations of paragraphs 23-82, 90-126, and 190-91 as if set forth here in full.

213.   There is a relevant market for the sale of variable speed wind turbines in the United States.

214.   GE has attempted to monopolize the relevant market.

215.   There is a dangerous probability that GE will succeed in its attempt to acquire or maintain monopoly power in the relevant market.

216.   GE has filed and maintained objectively baseless lawsuits for patent infringement without any good-faith belief that GE could prevail in the litigation and with the subjective intent of preventing, impeding, or delaying Mitsubishi's entry into the relevant market.

217.   GE's sham litigation has occurred in, and is having a substantial effect on, interstate commerce.

218.   GE's sham litigation has injured and will continue to injure competition in the relevant market.

219.   As a direct and proximate result of GE's sham litigation, Mitsubishi has been injured and has sustained damages.  Mitsubishi will continue to sustain predictable damages in the future.  Unless the activities complained of are enjoined, Mitsubishi will suffer immediate and irreparable injury for which Mitsubishi has no adequate remedy at law.

220.   As a direct competitor that was targeted by GE's sham litigation, Mitsubishi has standing to bring this claim.

221.   Mitsubishi is entitled to recover for its damages under Section 2 of the Sherman Act, 15 U.S.C. § 2.  Mitsubishi is also entitled to a permanent injunction restraining GE from engaging in the sham litigation.

## FOURTH CLAIM FOR RELIEF
### (OVERALL SCHEME OF ATTEMPTED MONOPOLIZATION IN VIOLATION OF 15 U.S.C. § 2)

222.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

223.   There is a relevant market for the sale of variable speed wind turbines in the United States.

224.   GE has attempted to monopolize the relevant market.

225.   GE has a specific intent to monopolize, and it has taken affirmative exclusionary acts in furtherance of its attempt to monopolize.

226.   There is a dangerous probability that GE will succeed in its attempt to acquire or maintain monopoly power in the relevant market.

227.   GE has engaged in a pattern and practice of exclusionary conduct in furtherance of its overall scheme to monopolize, including but not limited to:

a.   The filing and maintenance of sham patent infringement actions on the '039 patent;

b.   Obtaining four other patents through fraud on the PTO and threatening and filing sham litigation based on those patents against Mitsubishi and other manufacturers despite knowing that the patents were fraudulently obtained;

c.   Publicly threatening sequential sham litigation on unspecified patent claims that would disrupt its competitors' ability to sell in the United States market;

d.   Entering into licensing arrangements based on fraudulently-obtained patents;

e.    Threatening past and prospective purchasers, including Mitsubishi customers to discourage the purchase of variable speed wind turbines from competitors of GE not licensed by it, including Mitsubishi.

228.   The foregoing acts and the continuing course of GE's anti-competitive conduct have harmed and threaten to continue to harm consumers and competition in the marketplace.

229.   GE undertook these acts with the specific intent to attempt to monopolize.

230.   GE's conduct has occurred in, and is having a substantial effect on, interstate commerce.

231.   As a direct and proximate result of GE's exclusionary and anticompetitive conduct, Mitsubishi has been injured and has sustained damages. Mitsubishi will continue to sustain predictable damages in the future. Unless the activities complained of are enjoined, Mitsubishi will suffer immediate and irreparable injury for which Mitsubishi has no adequate remedy at law.

232.   As a direct competitor that was targeted by GE's anticompetitive conduct, Mitsubishi has standing to bring this claim.

233.   Mitsubishi is entitled to recover for its damages under Section 2 of the Sherman Act, 15 U.S.C. § 2. Mitsubishi is also entitled to a permanent injunction restraining GE from engaging in the anticompetitive acts.

## FIFTH CLAIM FOR RELIEF
### (UNFAIR COMPETITION UNDER § 43(A) OF THE LANHAM ACT)

234.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

235.   GE has made false or misleading statements to Mitsubishi's customers, to the press, and to the industry in the relevant market concerning the validity, enforceability, breadth, and applicability of its patents relating to variable speed wind turbines.

236.   GE has made false or misleading statements to Mitsubishi's customers, to the press, and to the industry in the relevant market about the characteristics and qualities of Mitsubishi's variable speed wind turbines.  These statements include GE representations that MHI's 2.4 megawatt wind turbines infringe on GE's existing patents.

237.   GE used baseless lawsuits for patent infringement against Mitsubishi as a marketing device to mislead Mitsubishi's customers and the public about Mitsubishi's wind turbines and to gain a competitive advantage over Mitsubishi.

238.   The statements described above, and others made by GE have actually deceived or have the tendency to deceive their audience.

239.   The statements described above, and others made by GE are material in that they are likely to influence purchasing decisions.

240.   GE's statements have been made in bad faith.

241.   Mitsubishi's product – the 2.4 megawatt wind turbine – is sold in interstate commerce.

242.   As a direct and proximate result of GE's conduct, Mitsubishi has suffered and continues to suffer actual damages, including in the form of lost prospective and actual business, lost profits, loss of goodwill and damage to its reputation and the reputation of its products, and out-of-pocket and other litigation-related expenses in an amount to be determined at trial.

243.   Unless the activities complained of are enjoined, Mitsubishi will suffer immediate and irreparable injury for which Mitsubishi has no adequate remedy.

## SIXTH CLAIM FOR RELIEF
### (TORTIOUS INTERFERENCE WITH CONTRACTUAL AND PROSPECTIVE BUSINESS RELATIONSHIPS)

244.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

245.   Mitsubishi has had a reputation for quality and valuable good will associated with its development, manufacture, and production of variable speed wind turbines and component parts.  Mitsubishi has had a reasonable expectation that its customers and prospective customers would purchase variable speed wind turbines and component parts from Mitsubishi.

246. Mitsubishi had a wind turbine supply contract with Edison Mission Energy (EME).

247. GE was aware of and illegally interfered with Mitsubishi's contract with EME through the improper means of intentionally misrepresenting that GE had valid patent claims and that Mitsubishi's 2.4 MW wind turbine infringed those patents.

248. GE further interfered with Mitsubishi's relationship with EME by threatening a patent infringement suit against EME based on invalid and fraudulently obtained patent claims.

249. As a result of GE's actions, EME has sued Mitsubishi to rescind the turbine supply contract.

250. These actions of GE constitute a direct and intentional interference with the business and/or contractual relations between Mitsubishi and its customer, EME.

251. The actions of GE described above also interfered with Mitsubishi's business relationships with existing and prospective customers.

252. GE's institution of repetitive, baseless patent litigation, making false and threatening statements, and employing other improper means, all of which were done with knowledge of Mitsubishi's contractual and business relationships and in bad faith, have resulted in injury to Mitsubishi's business and property.

253.   As a direct and proximate result of GE's interference, Mitsubishi has suffered and continues to suffer damages, including in the form of lost prospective and existing business, lost profits and higher risks and expenses in doing business, loss of goodwill and damage to its reputation and the reputation of its products, and out-of-pocket and other litigation-related expenses in an amount to be proved at trial.

254.   Unless the activities complained of are enjoined, Mitsubishi will suffer immediate and irreparable injury for which Mitsubishi has no adequate remedy.

### PRAYER FOR RELIEF

Wherefore, plaintiffs respectfully request entry of judgment in its favor and against defendant GE as follows:

A.   An award of compensatory damages in an amount in excess of $100,000,000, the exact amount to be determined at trial, to compensate Mitsubishi for the harm caused by GE's anticompetitive and tortious acts.

B.   An award of treble damages under the federal antitrust laws or the Lanham Act.

C.   An award of punitive damages against GE for its unlawful and malicious conduct, which was intended to harm Mitsubishi in the conduct of its business.

D.   A permanent injunction prohibiting further actions or threatened actions against Mitsubishi or its customers for infringement of the '039, '055, '221, '705, and '985 patents.

E.   Such other and further relief as the Court deems proper, including the disgorgement by the defendant of all sums that they have obtained pursuant to the scheme described herein.

F.   An award of attorneys' fees and costs.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for each and every one of the foregoing claims for relief.

Respectfully submitted,

_____

David R. Matthews (76072)
C. Eric Vester (2005231)
Matthews, Campbell, Rhoads, McClure,
    Thompson & Fryauf, P.A.
119 South Second Street
Rogers, Arkansas  72756
(479) 636-0875
(479) 636-8150 – Fax
drm@mcrmt.com
cev@mcrmut.com

Filiberto Agusti
Steven J. Barber
Kenneth P. Ewing
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
(202) 429-3902 – Fax

Attorneys for Plaintiffs Mitsubishi Heavy
Industries, Ltd. and Mitsubishi Power
Systems Americas, Inc.

Dated:  May 20, 2010